UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                 :

DAVID DEGONDEA,

                           :       04 Civ. 7457 (GBD) (DF)

                  Petitioner,

                           :       **REPORT AND**

   -against-                       **RECOMMENDATION**

                           :

CALVIN WEST, Superintendent,
Elmira Correctional Facility,         :

                   Respondent.    :
--------------------------------------------------------X

**TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:**

<u>**INTRODUCTION**</u>

      Petitioner David DeGondea ("Petitioner") seeks a writ of habeas corpus under 28 U.S.C.

§ 2254, challenging his 1995 conviction in the New York State Supreme Court, New York

County.  (Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus by a Person in State

Custody, dated Aug. 26, 2004 ("Petition") (Dkt. 1).)  Upon a jury verdict, Petitioner was found

guilty of first-degree murder, attempted first-degree murder, criminal possession of a weapon in

the second degree, and criminal sale of marijuana in the first degree.  (*Id*.)  Petitioner, who

received an aggregate sentence of 55 years to life, is currently incarcerated at the Elmira

Correctional Facility in Elmira, New York.  (*See id.*)

      In his Petition and supporting papers (*see* Petitioner's Memorandum of Law in Support of

the Petition, dated September 2004 (Dkt. 2) ("Pet. Mem."); Petitioner's Reply Memorandum of

Law In Support of the Petition, dated March 21, 2005 (Dkt. 13) ("Pet. Reply")), Petitioner pleads

due process and equal protection claims arising out of certain improprieties that allegedly

occurred at trial, on direct appeal, and on collateral review of his conviction in state court.

In opposition to the Petition, Respondent argues that Petitioner's claims should be dismissed as procedurally barred and/or without merit.  (*See generally* Memorandum of Law in Support of Answer Opposing Petition for Writ of Habeas Corpus, dated Feb. 23, 2005 ("Resp. Mem.") (Dkt. 9).)

For the reasons set forth below, I recommend that the Petition be dismissed in its entirety.

## FACTUAL BACKGROUND[1]

According to the testimony adduced at trial, Detective Luis Lopez ("Lopez"), together with other members of the New York City Police Department, conducted an undercover investigation, in the early part of 1993, into illegal firearm and drug sales at a store located on East First Street in Manhattan.  (Pet. Mem., at 10; Resp. Mem., at 6-7.)  Edward Arce ("Arce") worked at the store and was believed to be involved in the illegal activity.  (*Id*.)  As part of the investigation, Lopez posed as a drug dealer named "Columbia" and, in late January and early February, purchased guns and ammunition from Arce.  (Pet. Mem., at 10; Resp. Mem., at 7-8.)

On March 8, 1993, Lopez arranged to purchase several pounds of marijuana from Arce, and the two apparently agreed that the exchange would take place at the First Street store on March 10, 1993.  (*See* Pet. Mem., at 10; Resp. Mem., at 8-9.)  After Lopez made that

---

[1] The facts summarized herein are taken, in substantial part, from the parties' legal memoranda.  Although Respondent's Answer stated that Respondent would "docket a complete copy of the minutes of Petitioner's trial" (Answer, at ¶ 16), no such trial transcript was ever docketed.  Nevertheless, the parties have submitted extensive briefing detailing the relevant facts (Dkt. 2, 9, 13), most of which are not in dispute; Petitioner has submitted a 1898-page appendix that includes the minutes of the first round of voir dire, copies of all appellate and post-conviction motions, briefs and court decisions, and full transcripts of two post-trial reconstruction hearings (Dkt. 1), and Respondent has submitted the entire transcript of the jury charge and pertinent sections of the voir dire transcript (Dkt. 15) ("Trial Tr.").  Under the circumstances, Petitioner's claims can be adjudicated based upon the papers presently before the Court.

arrangement, he and the other officers decided that they would end the investigation and, on the agreed-upon date of the drug sale, they would raid the First Street store and arrest Arce and others involved.  (Pet. Mem., at 10-11; Resp. Mem., at 9.)  To that end, Lopez arrived at the store on March 10, 1993.  (*Id.*)  Serving as backup were Detectives Elizabeth Luyando ("Luyando"), David LaRose ("LaRose"), Gary Combs ("Combs"), and Roosevelt Devine ("Devine"), as well as Lieutenant Harold Knorr ("Knorr").  (Pet. Mem., at 11; *see also* Resp. Mem., at 9-10.)

Just after 3:00 p.m., Lopez – who was not wearing a police uniform or carrying a shield – entered the store and was informed that the marijuana he had ordered would be delivered shortly. (*See* Pet. Mem., at 11; Resp. Mem., at 10.)  Lopez then exited the store, communicated with his field team, and went back inside.  (*Id.*)  A short time later, Petitioner entered the store carrying a large shopping bag.  (Pet. Mem., at 11; Resp. Mem., at 11.)  Lopez then left the store and informed his field team that four pounds of marjiuana had arrived.  (*Id.*)  Sergeant Matthew Davis ("Davis") directed the field team to prepare to enter the store and make arrests.  (*Id.*) Lopez retrieved a bag of simulated money and returned to the storefront.  (*Id.*)  The backup team followed him to the storefront and positioned themselves nearby, ready to rush into the store and arrest Arce, Petitioner, and another man named Robert Heleneck ("Heleneck") who was in the store at the time.  (Pet. Mem., at 11-12; Resp. Mem., at 11-12.)

Heleneck opened the door for Lopez, and it appears that Petitioner was, at that time, in one of the store's back rooms.  (*See* Pet. Mem., at 12, 14; Resp. Mem., at 12-14.)  Lopez entered the store first and members of his backup team followed; the officers testified that they shouted "police" as they entered.  (Pet Mem., at 12; Resp. Mem., at 12.)  Near the store's entrance, a struggle ensued between certain officers and Heleneck.  (*Id.*)  The situation became chaotic and

resulted in a firefight, during which Petitioner, from the back room, shot Lopez.  (*See* Pet. Mem.,
at 12-13; Resp. Mem., at 12-14.)  Lopez eventually died from the gunshot wound, and a
subsequent autopsy revealed that the lethal bullet had entered Lopez's left arm, and then
punctured his lung and heart, suggesting that the left side of Lopez's body had faced Petitioner at
the time of the shooting.  (*See* Pet. Mem., at 16; Resp. Mem., at 22-23.)  The autopsy results and
other evidence further indicated that Lopez's left arm had been raised and extended at the time
he was shot.  (Pet. Mem., at 16, 19; Resp. Mem., at 22-23.)

After shooting Lopez, Petitioner continued to fire his gun from the back room, despite the
fact that the detectives made repeated attempts to identify themselves as police officers.  (*See*
Pet. Mem., at 13-14; Resp. Mem., at 13-14.)  At one point, Petitioner responded, "You're not the
police, you're not the real police."  (Pet. Mem., at 14; Resp. Mem., at 14.)  After Lopez had been
removed from the store, other members of the field team returned to arrest Petitioner and Arce,
although Petitioner continued to resist and insist that the individuals who had entered the store
were not actually police officers.  (*See* Pet. Mem., at 13-14; Resp. Mem., at 16-17.)  Petitioner
eventually surrendered, however, and tossed away his gun.  (Pet. Mem., at 14-15; Resp. Mem., at
17.)  He was arrested and taken to the police precinct.  (Pet. Mem., at 15; Resp. Mem., at 18-19.)
As Petitioner had suffered a gunshot wound in the incident, he was eventually taken to St.
Vincent's Hospital.  (*See* Pet. Mem., at 21; Resp. Mem., at 24.)

At trial, Petitioner testified in his own defense.  (Pet. Mem., at 19; Resp. Mem., at 26.)
On the stand, Petitioner admitted that he had been involved in drug dealing, and that he had fired
his gun in the March 10, 1993, incident.  (Pet. Mem., at 20-21; Resp. Mem., at 26, 29.)  He
claimed, however, that he had fired in self defense, based on his belief that the individuals in the

4

store were dangerous drug dealers who had intended to rob Petitioner, Arce, and Heleneck. (*See* Pet. Mem., at 20-21; Resp. Mem., at 29.)  In particular, Petitioner testified that

> I heard somebody being attacked at the front door.  So I started to walk up towards the front of the store and as I was walking up to the front of the store – I got to the threshold separating . . . the second and third room, I saw a black man with a gun run and take a position up behind the filing cabinet and then I saw Columbia, he ran around the corner with a pistol in his hand, his pistol pointing at me first.  Then he swung his gun towards Edward Arce and told Edward Arce to give him the shit and as soon as he swung the gun towards Edward Arce, I reached for my pocket, for my gun, and I was shot as I reached for my pocket and then I fired one, possibly two shots from my pocket.

(Pet. Mem., at 20-21.)

Petitioner further claimed that he did not hear Lopez or any of the other officers shout "police," and that they had not displayed anything that would suggest that they were, in fact, police officers.  (Pet. Mem., at 22; Resp. Mem., at 29.)  Petitioner testified that, had he known their true identity, he would never have shot at them.  (*Id.*)  Petitioner also testified that he surrendered after noticing flashing lights from a police car outside the store.  (Pet. Mem., at 21; Resp. Mem., at 29-30.)  He apparently concluded that the individuals in the store were, in fact, police officers when they did not flee despite the arrival of police cruisers outside the store.  (*Id.*)

## PROCEDURAL HISTORY

Petitioner was charged with various crimes arising out of the March 10, 1993, incident, and, on December 2, 1994, after a jury trial in which Arce was also a defendant, Petitioner was convicted of murder in the first degree, attempted murder in the first degree, criminal possession of a weapon in the second degree, and criminal sale of marijuana in the first degree.  (Pet. Mem., at 10, 26-27; Resp. Mem., at 1, 3.)  On January 9, 1995, Petitioner was sentenced to an aggregate

term of imprisonment of 55 years to life. (Pet. Mem., at 27-28; Resp. Mem., at 1, 3.) The long and complicated procedural history of Petitioner's prosecution, direct appeal, and motion for collateral relief from the state courts is discussed below, in relevant part.

### A.    Trial

#### 1.    *Voir Dire* **Proceedings**

Jury selection in Petitioner's trial commenced on November 2, 1994, before the Honorable James Leff, J.S.C., in New York Supreme Court, New York County. (*See* Appendix Accompanying Petition ("Pet. App.") , at 1.) Although the initial *voir dire* questioning was not transcribed, it appears that the prospective jurors were questioned by the prosecutor (Joel Greenbaum, Esq. ("Greenbaum")), Petitioner's trial attorney (Melvin Sachs, Esq. ("Sachs")), and co-defendant Arce's attorney (Jose Muniz, Esq. ("Muniz")). (*See id*. at 31-34.)

After counsel had finished questioning certain prospective jurors and Greenbaum had successfully challenged one for cause,  the following colloquy between the court and counsel occurred:

| | |
|---|---|
| The Court: | Any for cause [challenges] by the defendants? |
| Mr. Sachs: | Number Two, your Honor, Mr. []. It was clear that he said he couldn't be fair. |
| The Court: | That is not so. |
| Mr Sachs: | That he couldn't apply the law. |
| The Court: | That is denied for cause. He was the one who was a Grand Juror, banker, very intelligent gentleman. You have to use a peremptory. Number Two denied for cause. |
| Mr. Sachs: | Number five, your Honor, expressed that he couldn't be fair to the defendants in the case |

because the case involved, he had very definite views involving guns, police officers, he has a close friend from Narcotics, he couldn't be fair. That is what he actually said.

The Court:        That is denied.

Mr. Sachs:        Number Eight, [].

The Court:        He is the one who didn't like guns. That is denied. He didn't indicate he couldn't be fair and impartial. That is denied.

Mr. Sachs:        Number Eleven said he could not be fair. He said he couldn't be fair in the trial. He said he had many friends who are police officers.

The Court:        That is denied.

. . .

Mr. Sachs:        If your Honor pleases, it is clear for me, your Honor, certain jurors, I asked four for cause, I know Mr. Muniz joins in my application.

Mr. Muniz:        I do.

Mr. Sachs:        These jurors clearly expressed they couldn't be fair in this trial when they were asked.

The Court:        I heard their testimony. That is the easiest thing in the world. Denied.

Mr. Sachs:        Could you just ask those particular jurors --

The Court:        I am not going to do any[thing] of the kind. Go ahead and take the peremptories.

. . .

Mr. Sachs:        Your Honor, may we approach the bench?

The Court:        No, you're about to use your peremptory challenges. Go ahead.

7

Mr. Sachs: Can we approach very briefly, your Honor.

The Court: Do you understand [how] we work it?

Mr. Sachs: Yes, I do.

(*Id*. at 35-40.)

Thereafter, the following occurred at sidebar:

The Court: What is your problem?

Mr. Sachs: Your Honor, I would – I spoke to Mr. Muniz. There are certain jurors who definitely said they can't be fair.

The Court: That is not enough.

Mr. Sachs: Could you just question them?

The Court: I am not going to question any of them.  Use your peremptories.

Mr. Sachs: I had to use an inordinate amount this round.

The Court: You got reversible error.  Go ahead, use them.

Mr. Sachs: Your Honor, the specific jurors we asked are two, five, eight and eleven – two, eight and eleven.  Four was the one that was excused.

The Court: Five and Eleven are excused.

Mr. Greenbaum: Four and twelve [are excused;] you denied the other two.

The Court: Use your peremptories.

Mr. Sachs: Two, eight and eleven for cause.

The Court: Go ahead and use your peremptories.  I made a ruling and that is it.  Go ahead.

Mr. Greenbaum: Four and twelve.

8

| | | |
|---|---|---|
| The Court: | Go ahead. | |
| Mr. Sachs: | Your Honor, could we just make a record, can we do that? | |
| The Court: | I understand they said they couldn't be fair and I don't accept that. | |
| Mr. Sachs: | They had a predisposition. | |
| Mr. Muniz: | Because of the use of illegal guns, your Honor. | |
| Mr. Greenbaum: | You ask[ed] them their feelings, they still said they could be fair. | |
| The Court: | Use your peremptories and let's get out of here.  I am not going to keep this going forever. | |

(*Id*. at 40-42.)

At that point, Muniz and Sachs peremptorily struck jurors two, five, eight, and eleven. (Pet. Mem., at 10; Resp. Mem., at 70; *see also* Pet. App., at 42.)  Consequently, none of these jurors sat on the jury that ultimately convicted Petitioner.  It is undisputed that Petitioner exhausted his peremptory challenges prior to the conclusion of jury selection.  (*See* Resp. Mem., at 70.)

### 2.   **Jury Charge**

At the close of the evidence at trial, Petitioner's counsel requested that the court give the jury the opportunity to consider the defense of justification of a third person, which is set forth in

New York Penal Law § 35.15.[2]  Petitioner's counsel made this request because, in his view, the

evidence suggested that Petitioner may have shot Lopez in defense of Arce or Heleneck.  (*See*

Pet. Mem., at 24; Resp. Mem., at 102.)  The trial court declined to give the requested charge; it

only submitted to the jury the defenses of justification in defense of self and in defense of

robbery.  (Pet. Mem., at 24; Resp. Mem., at 103.)  Specifically, the court instructed the jury:

> Deadly physical force may only be employed by a person who
> reasonably believes that his assailant is using or is about to use
> unlawful deadly force against him or who reasonably believes that
> such person is committing or attempting to commit a robbery.
>
> . . .
>
> You must determine from the evidence whether the Defendant
> DeGondea reasonably believed that Detective Luis Lopez was
> using or was about to use deadly physical force against him.

---

[2] The relevant portion of the statute provides that, absent certain exceptions not relevant here, "[a] person may . . . use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself *or a third person* from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person."  N.Y. PENAL LAW § 35.15(1) (emphasis added).  The statute further provides that

> [t]he actor may not use deadly physical force upon another person under
> circumstances specified [above] unless:
>
> (a) The actor reasonably believes that such other person is using or
> about to use deadly physical force. Even in such case, however, the
> actor may not use deadly physical force if he or she knows that
> with complete personal safety, to oneself and others he
> or she may avoid the necessity of so doing by retreating . . . [or]
>
> (b) He or she reasonably believes that such other person is
> committing or attempting to commit a . . . robbery.

*Id*. at § 35.15(2).

10

It is a question of fact for you to determine whether Defendant DeGondea believed that he was in imminent danger of unlawful deadly physical force at the time he used the deadly force against Detective Luis Lopez.

You must also determine from the evidence whether the Defendant DeGondea reasonably believed that Detective Luis Lopez was committing or attempting to commit a robbery.

If you have determined that Defendant DeGondea in fact believed that deadly physical force was about to be used against him and that Detective Luis Lopez was committing or attempting to commit a robbery, you must still determine whether these beliefs were reasonable.

(Pet. Mem., at 25 (quoting Trial Tr., at 2399p-2399q, 2399t-2399u).)[3]

The trial court's jury instruction also included the limitations on the justification defense set forth in New York Penal Law § 35.27, which provides that "[a] person may not use physical force to resist an arrest, whether authorized or unauthorized, which is being effected or attempted by a police officer . . . when it would reasonably appear that the latter is a police officer."  (*See* Pet. Mem., at 26; Resp. Mem., at 103; Trial Tr., at 2399q.)

---

[3] For the counts charging Petitioner with the attempted murder of Combs, Devine, and Knorr, the trial court instructed the jury that, "[w]ith respect to justification[,] it is a question . . . for you to determine one, whether under all of the circumstances there was a reasonable grounds for the defendant DeGondea to believe that he was in imminent danger of unlawful, deadly physical force being used against him by [Devine, Combs, and Knorr] . . . or whether under all the circumstances there were reasonable grounds for DeGondea to believe that Devine, Combs, and Knorr were committing or about to commit a robbery."  (Pet. Mem., at 25-26 (quoting Trial Tr., at 2414).)

B.       **Direct Appeal**

1.       **The Parties' Initial Briefing to the Appellate Division**

On direct appeal, Petitioner claimed that the trial court had erred in three respects.  (*See* Pet. App., at 53-54.)  First, he argued that the court committed reversible error when it denied Petitioner's for-cause challenges to prospective jurors numbers five and 11 (respectively, "Juror No. 5" and "Juror No. 11").  (*Id*. at 83-87.)  Although there was no transcript of these jurors' statements during *voir dire* (as neither party had requested it), the challenge colloquy was transcribed, and Petitioner argued that the existing record was sufficient to permit review of the trial court's decision with regard to these particular jurors.  (*See id*.; *id*. at 177-179.)  Petitioner suggested that the court's denial of his for-cause challenges violated his due process rights, and he argued that, under New York law, reversal was required because Petitioner had been forced to exhaust all of his peremptory challenges.  (*See id*. at 83-87.)  Second, Petitioner claimed that the trial court had violated his due process rights when it refused to charge justification in defense of a third person, as, according to Petitioner, a reasonable view of the evidence supported Petitioner's claim that he shot at Lopez – whom Petitioner had purportedly mistaken as an armed robber – in defense of Arce and Heleneck.  (*Id*. at 87-93.)[4]

Within the section of his appellate brief that set forth his first claim, Petitioner also arguably raised an additional claim, by stating that the trial court had independently erred when it denied Petitioner's various requests to re-question certain jurors on the record.  (*See* Pet. App., at 86.)  As to this claim, Petitioner's memorandum to the Appellate Division stated:

---

[4] Petitioner also raised a third claim on direct appeal that is not at issue in the present habeas Petition.  (*See id*. at 94-101.)

> At the very least, the court should have granted counsel's numerous requests to further question the prospective jurors on the record so that they could state, in unequivocal terms, that they could be fair.  *See People v. David Cruz*, [244 A.D.2d 417, 418 (2d Dept. 1997)] ("it is the court's duty to assure that jurors are not approved when challenged for cause in the face of equivocal responses").  Indeed, the court, in denying counsel's numerous requests to question the prospective jurors on the record, independently erred by foreclosing appellant's ability to create a complete record of the jury selection.  *See People v. Harrison*, 85 N.Y.2d 794, 795-97 (1995); *People v. Alston*, 222 A.D.2d [294, 295 (1st Dept. 1995)]; *People v. Fleming*, 221 A.D.2d 287 (1st Dept. 1995).

(Pet. App., at 86.)

The People responded by arguing that the record was not sufficient to determine whether the trial court had properly denied Petitioner's for cause challenges to Jurors Nos. 5 and 11, although, according to the People, to the extent the record did reveal anything, it suggested that the trial court's denial of Petitioner's for-cause challenges was a proper act of judicial discretion. (*Id*. at 156-60.)  As to Petitioner's argument that the trial court had erred by denying Petitioner's requests to re-question certain jurors on the record, the People essentially argued that Petitioner's claim was precluded by his own decision not to request, prior to the commencement of the *voir dire* proceedings, that those proceedings be recorded.  (*Id*. at 159 n.)  The prosecution further argued that Petitioner had not been entitled to a jury charge regarding justification in defense of a third person, as, in its view, no reasonable view of the evidence would have supported Petitioner's claim that he had shot Lopez in defense of someone else.  (*Id*. at 147-51.)  In the alternative, the People argued that, even if Petitioner had been entitled to such a charge, the trial court's error was harmless, as, in convicting Petitioner of first degree murder, the jury necessarily found that Petitioner knew or reasonably should have known that Lopez was a police

officer, and such a finding would have foreclosed Petitioner from relying on any type of

justification defense.  (*See id.* at 151-53.)

### 2. The Appellate Division's Decision Remanding the Matter To the Trial Court for a Reconstruction Hearing

On December 3, 1998, the Appellate Division held Petitioner's appeal in abeyance and

remanded the matter to the trial court to hold a reconstruction hearing.  *See People v. DeGondea*,

682 N.Y.S.2d 139 (1st Dep't 1998) ("*DeGondea I*").  In so doing, the court held that

> [s]ince the jurors' responses during *voir dire* questioning were not
> recorded, it is impossible to determine with any degree of accuracy
> what the jurors actually stated, and whether their statements
> warranted excusal for cause.  Under such circumstances,
> meaningful appellate review of [Petitioner]'s jury selection claim
> is precluded (*see, People v. Harrison*, [628 N.Y.S.2d 939 (1995)]).
>
> . . .
>
> The question remaining is the appropriate remedy.
> Generally, an appealing defendant bears the burden of providing
> an adequate record to review his appellate claims.  Here, it is
> undisputed that neither party requested that the relevant portion of
> the voir dire questioning be recorded.  However, after the court
> initially denied the challenges for cause, defense counsel made
> repeated requests for the court to requestion the jurors as to
> whether they could be fair, and the court denied each request.
> Thus, defendant was effectively thwarted from creating an
> adequate record for appellate review (*see, People v. Harrison,
> supra*).
>
> Nonetheless, the Court of Appeals has held that the absence
> of a stenographic transcript does not per se require a reversal of a
> conviction.  Rather, reversal is required only if the defendant is
> prejudiced, and a defendant will not be prejudiced if the record can
> be accurately reconstructed.  We believe that a remand for a
> reconstruction hearing is appropriate in these circumstances.

*DeGondea I*, 682 N.Y.S.2d at 140 (citations omitted).

14

### 3.    Reconstruction Proceedings

The judge who had presided at Petitioner's trial died before the Appellate Division remanded Petitioner's case for reconstruction proceedings.  (*See* Pet. Mem., at 32.)  The matter was thus remanded to another trial judge, the Honorable Marcy L. Kahn, J.S.C.  (*See* Pet. App., at 797.)  In a pre-hearing memorandum, Petitioner argued that the People should bear the burden of demonstrating, beyond a reasonable doubt, that reconstruction of the record was possible, and, by a preponderance of the evidence, that the prospective jurors in question had stated that they could be fair.  (*Id.* at 216-20.)  Petitioner argued that basic fairness and due process required that these burdens be placed on the People, as his right to present a meaningful appeal had been negatively impacted by the trial court.  (*Id.*)

The reconstruction hearing commenced on January 5, 1999, and was continued on January 22, January 29, February 19, March 9, March 30, and June 11, 1999.  (*See id.* at 224, 237, 343, 442, 570, 665, 672.)  During these proceedings, the reconstruction court ruled, as an initial matter, that the People would bear the burden of proof, by a preponderance of the evidence, both that reconstruction was possible, and that the jurors in question had made statements that "unequivocally expressed an ability to render an impartial verdict."  (*See id.* at 804-07.)  Several witnesses were called, including Greenbaum (*id.* at 256-370); Muniz (*id.* at 372-429); Peter Fleming ("Fleming"), an assistant district attorney, who had participated in Petitioner's criminal trial (*id.* at 446-501); Sachs (*id.* at 502-67); Petitioner (*id.* at 608-13); and Jurors Nos. 5 and 11 (*id.* at 577-606, 636-61).

**4.      Petitioner's Request for the Release
of Contact Information for Juror No. 2**

On March 5, 1999 – in the midst of the reconstruction proceedings – Petitioner submitted

a letter to the Appellate Division seeking the release of information relating to prospective juror

number two ("Juror No. 2") so that Petitioner could call Juror No. 2 as a witness and reconstruct

the statements he had made during *voir dire*.[5]  (*Id*. at 191-93.)  Petitioner explained that, in his

initial brief to the Appellate Division, he did not challenge the trial court's denial of his request

to strike Juror No. 2 for cause because the trial court had found that that juror had never stated

that he could not be impartial.  (*Id*. at 191-92.)  Petitioner claimed, however, that certain

evidence adduced during the reconstruction proceedings (specifically, the notes and testimony of

counsel who had been present during the *voir dire*) raised "significant questions" about the

propriety of the trial court's ruling as to Juror No. 2, and, for this reason, Petitioner sought to call

Juror No. 2 as a witness at the reconstruction hearing.  (*Id*. at 192-93.)

_____

[5] Petitioner made his request under New York Judiciary Law § 509(a), which states:

> The commissioner of jurors shall determine the qualifications of a
> prospective juror on the basis of information provided on the
> juror's qualification questionnaire.  The commissioner of jurors
> may also consider other information including information
> obtained from public agencies concerning previous criminal
> convictions.  The commissioner may require the fingerprinting of
> all persons drawn for grand jury service.  A record of the persons
> who are found not qualified or who are excused, and the reasons
> therefor, shall be maintained by the commissioner of jurors.  The
> county jury board shall have the power to review any
> determination of the commissioner as to qualifications and
> excuses.  Such questionnaires and records shall be considered
> confidential and shall not be disclosed except to the county jury
> board or as permitted by the appellate division.

By letter dated March 10, 1999, the People opposed Petitioner's request, arguing that Petitioner had not demonstrated that the release of information relating to Juror No. 2 would lead to relevant evidence.  (*See id.* at 194-96.)  The People also asserted that Petitioner's request was procedurally improper, and should have been the subject of a motion pursuant to New York Criminal Procedure Law § 440.10.  (*See id*. at 196-97.)

On March 25, 1999, the Appellate Division summarily denied Petitioner's request for the release of information regarding Juror No. 2.  (*Id*. at 200.)

### 5.      The Reconstruction Court's Findings of Fact

On September 7, 1999, the reconstruction court issued a written decision setting forth its findings of fact.  (*Id*. at 797-851.)  The court first found that the evidence adduced at the reconstruction proceedings created an adequate record for appellate review.  (*Id*. at 836.)  The court expressly declined to make findings of fact as to the statements made by Juror No. 11, as the court noted that Petitioner had conceded at oral argument that this juror had affirmed during the *voir dire* proceedings that he could be fair and impartial.  (*See id*. at 851.)  As to Juror No. 5, the reconstruction court ultimately found that

> the credible evidence . . . demonstrated that it [was] more likely than not that [Juror No. 5] stated, in substance, that he would be uncomfortable serving on the jury due to his relationship with one or more police officers, and that such feelings might affect his ability to be fair and impartial in the case.

(*Id*. at 850-51.)

### 6.      Supplemental Briefing to the Appellate Division

After the reconstruction court transmitted its findings of fact to the Appellate Division, Petitioner and the prosecution submitted further briefing to that court addressing (a) the issues

Petitioner had raised in his initial brief on appeal, and (b) the issue that Petitioner had subsequently raised concerning Juror No. 2. (*See id.* at 853-910.) Petitioner first asserted that, in light of the reconstruction court's findings of fact, the trial court had committed reversible error when it denied Petitioner's for cause challenge to Juror No. 5. (*See id.* at 896-906.) Petitioner next argued that the Appellate Division had violated his due process rights when it denied his request for the release of contact information regarding Juror No. 2, which would have enabled Petitioner to call that prospective juror as a witness in the reconstruction hearing and reconstruct the statements that Juror No. 2 had made during jury selection. (*See id.* at 906-10.) Petitioner claimed that this ruling was particularly unfair given that the trial court had denied his request to recall Juror No. 2 for further questioning during *voir dire*, and that the attorney notes produced during the reconstruction hearing provided supposed "new information" as to how Juror No. 2 had responded to the *voir dire* questions that were not transcribed. (*See id.*) Petitioner asked for his conviction to be reversed, or, in the alternative, that the matter be remitted to the trial court to reconstruct Juror No. 2's *voir dire* responses. (*Id.* at 910.)

The People submitted a supplemental memorandum, as well, asserting that the reconstruction court's findings of fact were unsupported by the record, and that, in any event, even if the Appellate Division were to accept those findings of fact, Petitioner would not be entitled to any relief. (*Id.* at 944-67.) The People further argued that Petitioner's claim regarding Juror No. 2 was not reviewable on appeal, and that, in any event, the claim lacked merit. (*Id.* at 967-74.)

### 7.     The Appellate Division's Decision Denying Petitioner's Appeal

On February 17, 2000, the Appellate Division denied Petitioner's appeal.  *People v. DeGondea*, 705 N.Y.S.2d 20 (1st Dep't 2000) ("*DeGondea II*").  The court first noted that Petitioner had abandoned his claim concerning Juror No. 11, and that his jury selection claim thus concerned only Juror No. 5.  *Id*. at 21.  The Appellate Division went on to reject the reconstruction court's ruling that the prosecution had the burden of proof at the reconstruction hearing.  *Id*. at 21.  On this point, the Appellate Division stated:

> The reconstruction court construed our prior order as finding that
> [Petitioner] had "raised an appealable issue . . . concerning
> whether the jurors' statements entitled [Petitioner] to cause
> excusals," and it concluded that the People had the burden of
> proving by a preponderance of the evidence both that
> reconstruction was possible, and that each juror had made
> statements which unequivocally expressed an ability to render an
> impartial verdict.  However, our prior order specifically stated that
> "the contradictory statements by the court, defense counsel and the
> prosecutor make it clear that the existing record establishes
> nothing definitively" . . . .  Thus, while the reconstruction court
> correctly concluded that the proponent of an off-the-record
> statement generally has the burden of proving that the statement
> was made . . . , here it was [Petitioner]'s burden to establish by a
> preponderance of the evidence that a juror expressed a bias which
> would have precluded him from rendering an impartial verdict.

*Id*.

The Appellate Division then held that, based on its "independent review" of the hearing transcript, Petitioner had not carried his burden.  *Id*. at 22.  According to the court, while the record supported the reconstruction court's finding that Juror No. 5 had initially expressed "discomfort sitting on a case involving a police officer," the totality of the record did not establish that the trial court had erroneously denied Petitioner's for cause challenge to that juror. *Id*. at 22.  This determination was based, in part, on Juror No. 5's testimony and other evidence

19

adduced at the reconstruction hearing, which, according to the Appellate Division, demonstrated that, during *voir dire*, he had probably stated that his friendship with police officers would not affect his ability to be fair and impartial.  *Id*.

The Appellate Division also rejected Petitioner's claim that the trial court had committed reversible error when it declined to charge the jury on justification in defense of a third party. *Id*. at 22-23.  The Appellate Division concluded that the trial court's refusal to offer this charge was error, but that the error was "harmless."  *Id*. at 22.  The court explained that

> [b]y its verdict convicting defendant of murder and the attempted murder of two police officers, the jury necessarily found that [Petitioner] knew or should have known that the intended victims were police officers engaged in their official duties at the time of the shooting (*see*, Penal Law § 125.27 (1))(a) (i)), since such knowledge is an element of those crimes.  Moreover, pursuant to the court's instructions on Penal Law § 35.27 . . . , the jury was told that defendant was not entitled to use any physical force to resist an arrest by a police officer who reasonably appeared to be the same, and thus, was not entitled to claim justification at all under such circumstances.  Thus, as the jury made findings which precluded the defense of justification, the court's refusal to charge the "defense of a third person" prong of the justification defense did not prejudice him.

*Id*. at 22-23 (emphasis omitted).

The court noted further that, while Penal Law § 35.27 (quoted *supra* at 11) would not serve to preclude a criminal defendant "from claiming justification to resist an unprovoked police attack or excessive police force . . . , this clearly was not [Petitioner]'s theory in this case."  *Id*. at 23 n.3.  The court did not specifically address Petitioner's claim that his right to a meaningful appeal had been violated by the Appellate Division's prior order denying Petitioner's motion for the release of information regarding Juror No. 2 in connection with the reconstruction hearing.  *See id*. at 22-23.

### 8.    Petitioner's Application for Leave To
### Appeal To the New York Court of Appeals

By letter dated April 11, 2000, Petitioner sought leave to appeal his conviction to the New York Court of Appeals.  (Pet. App., at 1000-08.)  In his leave letter, Petitioner raised three separate issues.  First, he claimed that the Appellate Division had erred when it held that Petitioner had the burden of proof at the reconstruction hearing; he thus urged the Court of Appeals to consider the issue of whether the criminal defendant or the prosecution bears the burden of proof at a reconstruction hearing, where the trial court had purportedly prevented the defendant from making a record of prospective jurors' statements at the time of *voir dire*.  (*Id*. at 1000-05.)  Second, Petitioner argued that the Appellate Division had erred in conducting a harmless error analysis when it rejected Petitioner's claim regarding the trial court's failure to instruct the jury on justification in defense of a third person.  (*Id*. at 1000, 1005-08.)  Petitioner took the position that due process entitled him to "'any recognized defense for which there exist[ed] evidence sufficient for a reasonable jury to find in his favor'" (*id*. at 1008 (quoting *Matthews v. United States*, 485 U.S. 58, 63 (1988))); in Petitioner's view, the harmless error rule applied by the Appellate Division was inconsistent with this principle.  (*See id*. at 1000, 1005-08.)  Finally, in a footnote, Petitioner claimed that his due process rights had also been violated when the Appellate Division denied his motion to release information that would have enabled him to call Juror No. 2 as a witness at the reconstruction hearing and to attempt to reconstruct the statements made by that juror on *voir dire*.  (*See id*. at 1005 n.1.)

On May 8, 2000, the People submitted a letter in opposition (*id*. at 1009-17), and, on June 16, 2000, the Court of Appeals denied Petitioner's application for leave to appeal, *People v. DeGondea*, 95 N.Y.2d 834 (N.Y. 2000).

21

### C.      Petitioner's Motion Pursuant To
###         New York Criminal Procedure Law § 440.10

#### 1.      Petitioner's Motion

On February 19, 2001, defense counsel located Juror No. 2 by cold calling "numerous"

people with the same last name in the New York City phonebook.  (Pet. Mem., at 62; *see also*

Pet. App., at 1055.)  Having located Juror No. 2, Petitioner moved, on April 5, 2001, to vacate

the trial court's judgment pursuant to New York Criminal Procedure Law §§ 440.10(1)(f)

and (h).  (Pet. App., at 1019-33.)

In his Section 440.10 motion, Petitioner raised three separate grounds for relief.  First, he

claimed that the trial court had improperly denied his for-cause challenge to Juror No. 2,

"which," he argued, "resulted from the court's failure to adequately supervise the *voir dire* of the

prospective jurors." (Pet. App., at 1022-23; *see also id.* at 1034-38.)  Petitioner claimed that the

trial judge's alleged failure to provide sufficient supervision of the *voir dire* proceedings could

entitle him to relief under N.Y.C.P.L. § 440.10(1)(f),[6] and he thus sought a hearing to explore the

issue.  (Pet. App., at 1034-38.)  Second, Petitioner pointed to evidence obtained during the

reconstruction proceedings suggesting that, during portions of the jury selection, the trial court

was inattentive and may have even been sleeping, rendering the judge, in Petitioner's view,

"constructive[ly] absen[t]" from those proceedings.  (*Id.* at 1023, 1038-40.)  Petitioner sought a

hearing to explore this issue as well, and he took the position that judicial somnolence had

violated his constitutional rights and would, in itself, require reversal under N.Y.C.P.L.

---

[6] Section 440.10(1)(f) provides that "[a]t any time after the entry of a judgment, the court
in which it was entered may, upon motion of the defendant, vacate such judgment upon the
ground that . . . [i]mproper and prejudicial conduct not appearing in the record occurred during a
trial resulting in the judgment which conduct, if it had appeared in the record, would have
required a reversal of the judgment upon an appeal therefrom."

§ 440.10(1)(h).[7]  (*Id.*)  Third, Petitioner argued that his due process and equal protection rights had been violated by the trial court's refusal, during *voir dire,* to permit Juror No. 2 to be recalled for further questioning on the record.  (*Id.* at 1023; 1040-42.)

Petitioner contended that these three claims were properly brought on a Section 440.10 motion, as he could not have raised them on direct appeal because the trial record was insufficient.  (*Id.* at 1042-46; *see also* N.Y.C.P.L. § 440.10(2)(a) and (c).)  He also argued that the court should not summarily reject his claim under N.Y.C.P.L. § 440.10(3)(a),[8] because he had acted with due diligence to create an adequate record for appeal.  (*Id.* at 1046-50.)

On June 4, 2001, the People opposed Petitioner's Section 440.10 motion (*see id.* at 1061-66), and, on July 9, 2001, Justice Kahn issued a decision granting Petitioner a hearing to determine:  (1) whether the trial court had failed to adequately supervise *voir dire*; and

---

[7] Section 440.10(1)(h) provides that "[a]t any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that . . . [t]he judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States."

[8] This section provides that the state court may deny a Section 440.10 motion where:

> Although facts in support of the ground or issue raised upon the motion could with due diligence by the defendant have readily been made to appear on the record in a manner providing adequate basis for review of such ground or issue upon an appeal from the judgment, the defendant unjustifiably failed to adduce such matter prior to sentence and the ground or issue in question was not subsequently determined upon appeal.

(2) whether Juror No. 2's responses revealed that he should have been excused for cause.  (*Id.* at

1073-91.)[9]

### 2.     The Evidentiary Hearing and the Motion
### Court's Decision Vacating Petitioner's Conviction

Justice Kahn presided over the Section 440.10 hearing, which commenced on July 31,

2001, and continued on August 27, October 16, and October 25, 2001.  (*Id.* at 1073, 1092, 1231,

1415, 1464.)  Called as witnesses were Juror No. 2 (*id.* at 1104-41); Mary Ann Shaw

(Petitioner's mother), who was present at the trial (*id.* at 1141-91); Petitioner (*id.* at 1192-1229);

Fleming (*id.* at 1234-68); Greenbaum (*id.* at 1268-1337); Sachs (*id.* at 1341-1410); Susan

Krischnel, who was then an intern at the Manhattan District Attorney's Office, and who had

assisted Greenbaum and Fleming at Petitioner's trial (*id.* at 1418-62); and Muniz (*id.* at 1466-

1523).

On December 20, 2001, the motion court granted Petitioner's Section 440.10 motion and

vacated his conviction.  (*Id.* at 1614-69.)  The court found that Juror No. 2 had expressed the

view that society was "too liberal" in its approach to drug crime (*id.* at 1627-34), and that murder

could never be justified (*id.* at 1634-36).  The motion court concluded that, notwithstanding any

"formulaic" assurances of impartiality that Juror No. 2 had given, these statements raised

"serious questions" about his qualifications for jury service.  (*Id.* at 1637-38.)  The court also

determined that the trial court had "appeared to be dozing and in fact failed to pay attention

during portions of the . . . jury selection."  (*Id.* at 1645.)

---

[9] Justice Kahn summarily denied Petitioner's third claim based on her conclusion that the claim had been "previously resolved on direct appeal" (*id.* at 1090 (citing N.Y.C.P.L. § 440.10(2)(a))), even though the direct appeal had not directly addressed Juror No. 2 in this regard.  Petitioner does not challenge this aspect of the courts' treatment of his Section 440.10 motion.

24

Based on these findings of fact, the motion court held that Petitioner was entitled to relief under N.Y.C.P.L. § 440.10(1)(f) (*see* Pet. App., at 1663), which, as noted above, provides that a trial court may vacate a judgment where "[i]mproper and prejudicial conduct not appearing in the record occurred during a trial resulting in the judgment which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefrom." N.Y.C.P.L. § 440.10(1)(f).  In the motion court's view, the trial court's inattention amounted to "improper conduct" for purposes of the statute (Pet. App., at 1651-54), and this conduct prejudiced Petitioner in that it resulted in the court's erroneous denial of Petitioner's for-cause challenge to Juror No. 2 (*id.* at 1654-55), which, had the matter appeared on the trial record, would have required reversal on direct appeal (*id.* at 1655-63).[10]  The motion court also rejected the People's argument, made pursuant to N.Y.C.P.L. § 440.10(3)(a), that Petitioner should have raised the issue of the trial judge's inattentiveness on direct appeal, and, to the extent the record was inadequate to permit direct review of the issue, this was the result of Petitioner's own failure to record a formal objection to the court's conduct.  On this point, the motion court found that the Petitioner had adequately demonstrated that an objection would have been unavailing, in that counsel was "'substantially impaired' in his ability to register an objection to the trial court's somnolence."  (Pet. App., at 1086; *see also id.* at 1647 n.9.)

---

[10] Although not relevant here, the motion court also concluded that, through its inattentiveness during *voir dire,* the trial court had "abdicate[d its] non-delegable duty to oversee the voir dire," which "deprived [Petitioner] of his right to trial by jury guaranteed under Article I, section 2 of the New York State Constitution."  (Pet. App., at 1666, 1668.)

### 3.     The Appellate Division's Reversal and
### Reinstatement of Petitioner's Conviction

In September, 2002, the People appealed the motion court's decision granting

Petitioner's Section 440.10 motion.  (Pet. App., at 1670-1737.)  Petitioner submitted an

opposition in February 2003.  (*Id*. at 1738-1813.)  On December 9, 2003, the Appellate Division

reversed the motion court's decision and reinstated Petitioner's conviction.  *See People v.*

*DeGondea*, 769 N.Y.S.2d 490 (1st Dep't 2003) ("*DeGondea III*").

The Appellate Division held that Petitioner's claim that had succeeded before the motion

court – *i.e.* the claim that the trial court had been inattentive during *voir dire*, and that this was

prejudicial and thus warranted vacatur – should have been denied on both procedural and

substantive grounds.  With respect to the procedural basis for rejecting Petitioner's claim, the

Appellate Division held that Petitioner had "unjustifiably failed to use due diligence to cause the

matter of the trial judge's somnolence or inattention 'to appear on the record in a manner

providing adequate basis for [appellate] review.'"  *DeGondea III*, 769 N.Y.S.2d at 497 (quoting

N.Y.C.P.L. § 440.10(3)(a)).  The court further observed that Petitioner could have recounted on

the record the disqualifying statements that Juror No. 2 had purportedly made, but inexplicably

failed to do so.  *Id*. at 498.  The Appellate Division disagreed with the motion court's ruling that

Petitioner had been effectively thwarted from raising an objection to the trial court's lack of

attentiveness, and, substituting its discretion for that of the motion court, found that Petitioner's

claim was procedurally barred under N.Y.C.P.L. § 440.10(3)(a).  *DeGondea III*, 769 N.Y.S.2d at

497 (finding that Petitioner had "inappropriately used § 440.10 to collaterally attack his

conviction based on facts known to him during trial that he unjustifiably failed to place on the

record").

In concluding that this was the appropriate act of judicial discretion, the Appellate Division acknowledged that, had Petitioner raised on direct appeal the issue of the denial of his for-cause challenge to Juror No. 2 and been successful on that claim, there would have been a basis for reversal of his conviction. *Id.* at 499. Nonetheless, the court was persuaded that Section 440.10(3)(a) should be applied, in light of (1) Petitioner's apparently strategic decision not to raise, on the record, the issue of the trial judge's appearance of somnolence, (2) Petitioner's decision not to raise the for-cause challenge to Juror No. 2 on direct appeal, (3) Petitioner's decision to wait more than six years after his sentencing before filing a motion under Section 440.10, despite the facts regarding *voir dire* being known to him, and (4) the fact that no biased juror actually sat on Petitioner's jury. *Id.* at 499-500.

As to Petitioner's separate claim that Juror No. 2 should have been excused for cause, the Appellate Division noted that, while this was not the focus of the proceedings before the motion court, "any claim of error relating to Juror No. 2 would[, in any event, have been] barred from consideration . . ., since such issue could have been considered on the direct appeal, as were the issues relating to Jurors Nos. 5 and 11." *Id.* at 496. The Appellate Division also noted that Petitioner had failed to preserve his claim regarding Juror No. 2, by failing "to raise the [juror's] statements concerning drug crime and justification" at trial, *id.* at 498, and that "Juror No. 2's qualifications were not a proper subject for the reconstruction hearing held in connection with the direct appeal, since [Petitioner] chose not to raise any issue concerning Juror No. 2 in his original appellate brief, thereby abandoning any such issue," *id.* at 500.

Despite the procedural bars, the Appellate Division nevertheless went on to review the merits of Petitioner's claim regarding judicial inattentiveness, and found that Petitioner had not carried his burden of demonstrating that the trial court was inattentive or asleep during the trial.

27

*Id.* at 501-03.  Further, the court observed "that the denial of the challenge to Juror No. 2 [could not] be causally tied to the judge's alleged somnolence in any event, since, as [the motion court] acknowledged, even the witnesses who testified to the judge's somnolent appearance were unable to say whether the judge gave that appearance during the voir dire of Juror No. 2."  *Id.* at 503.  For these reasons, as well, the court reversed the motion court's decision vacating Petitioner's conviction.  *See id.*[11]

### 4.  Petitioner's Application for Leave To Appeal To the New York Court of Appeals

By letter dated April 1, 2004, Petitioner appealed the denial of his Section 440.10 motion to the New York Court of Appeals.  (Pet. App., at 1865-81.)  Petitioner's letter seeking leave to appeal primarily asked the Court of Appeals to review the Appellate Division's rulings concerning judicial somnolence and inattention, although Petitioner also asserted that "the Appellate Division's reversal of [the motion court]'s order vacating his conviction . . . deprived [him] of any New York state forum in which to challenge [the trial court]'s denial of his challenge for cause to juror 2."  (*Id.* at 1879.)  Petitioner then traced the procedural history of his prosecution, appeal, and Section 440.10 motion, pointing to (a) the trial court's denial of his requests to question Juror No. 2 on the record; (b) the Appellate Division's denial of his request for the release of contact information for Juror No. 2 during the reconstruction hearing; and (c) the Appellate Division's decision reversing the motion court's vacatur of Petitioner's conviction on procedural and substantive grounds.  (*Id.* at 1879-80.)  Petitioner argued that, by

_____

[11] The Appellate Division also reversed the motion court's legal ruling that Petitioner was entitled to a new trial under N.Y.C.P.L. § 440.10(1)(h), *DeGondea III*, 769 N.Y.S.2d at 500-01; *see also supra* n.7, n.10.  The court held that a claim brought under the New York constitution that is based solely on judicial somnolence or inattention is subject to preservation requirements and requires a showing of prejudice.  *See DeGondea III*, 769 N.Y.S.2d at 500-04.

28

these rulings, the trial court and the Appellate Division effectively deprived him of any sort of appellate review of his claim regarding Juror No. 2, which, Petitioner asserted, violated his due process and equal protection rights.  (*See id.*)

The prosecution opposed Petitioner's leave application by letter dated April 29, 2004. (*See id.* at 1882-87.)  As to Petitioner's claim that the New York courts had effectively deprived Petitioner of appellate review of his for-cause challenge to Juror No. 2, the prosecution essentially argued that any deprivation in that regard was of Petitioner's own making.  (*Id.* at 1886 n.1.)  On this point, the prosecution asserted that it was Petitioner who had failed to ensure that the *voir dire* proceedings be transcribed in full, and who had failed to assert on direct appeal that the trial court had erred in denying his for-cause challenge to Juror No. 2.  (*Id.*)

On May 14, 2004, the Appellate Division denied Petitioner's application for leave to appeal the Appellate Division's December 9, 2003, decision.  *People v. DeGondea*, 781 N.Y.S.2d 297 (N.Y. 2004).

### D.   Instant Habeas Petition

Petitioner timely filed his federal habeas Petition on September 21, 2004,[12] together with a supporting memorandum and five-volume appendix.  (*See* Dkt. 1, 2.)  The Petition principally raises two claims:  (1) that the trial court deprived Petitioner of due process and equal protection by denying Petitioner adequate appellate review of alleged infirmities in the jury selection process (*see* Pet. Mem., at 89-109); and (2) that the trial court violated Petitioner's due process

---

[12] As Petitioner correctly contends, and Respondent does not dispute, the Petition is timely.  (*See* Pet. Mem., at 81-82.)  Not counting the time when Petitioner's post-conviction proceedings were pending, *see* 28 U.S.C. § 2244(d)(2) (2000), it was filed within one year of the date that Petitioner's conviction became final for purposes of habeas review, *i.e.*, 90 days after the Court of Appeals denied Petitioner's application for leave to appeal, *see id.* § 2244(d)(1)(A).

rights when it declined to instruct the jury on justification in defense of a third person, and that

such error prejudiced Petitioner (*see* Pet. Mem., at 110-125).

On February 23, 2005, Respondent opposed the Petition by filing an Answer in

Opposition to Petition for a Writ of Habeas Corpus, dated February 23, 2005 (Dkt. 8), along with

a memorandum of law (Dkt. 9).  Petitioner submitted a reply memorandum on March 21, 2005.

(Dkt. 13.)

**DISCUSSION**

**I.    APPLICABLE LEGAL STANDARDS**

**A.    Exhaustion**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

court generally may not consider a petition for a writ of habeas corpus unless the petitioner has

exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404

U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997).  To satisfy the exhaustion

requirement, a habeas petitioner must have "fairly presented" his claims to the state courts,

thereby affording those courts the "'opportunity to pass upon and correct alleged violations

of . . . prisoners' federal rights."  *Picard*, 404 U.S. at 275 (citing *Wilwording v. Swenson*, 404

U.S. 249, 250 (1971)).  There are several ways by which a petitioner can fairly present a federal

claim to the state appellate court, including by citing the relevant provisions of the federal

Constitution in his appellate brief.  *See Davis v. Strack*, 270 F.3d 111 (2d Cir. 2001).

Once the state courts are apprised of the constitutional nature of a petitioner's claims, the

exhaustion requirement is fulfilled when those claims have been presented to "the highest court

of the pertinent state."  *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted).  A

petitioner will be found to have satisfied this requirement where the "fair import" of the

30

Petitioner's total application to the Court of Appeals suggests a request for review of the relevant constitutional claims.  *See Galdamez v. Keane*, 394 F.3d 68, 74-75 (2d Cir. 2005).

Despite the exhaustion requirement, AEDPA provides that a federal court may dismiss an unexhausted claim on the merits.  *See* 28 U.S.C. § 2254(b)(2); *see also, e.g., Aparicio v. Artuz*, 269 F.3d 78, 91 n.5 (2d Cir. 2001).

## B.   Standard of Review

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground").  The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result.[13] *Williams*, 529 U.S. at 405-06.  An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced."  *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003).  The state court's decision, however, "must have been more than incorrect or erroneous" –  rather, "[t]he state court's application must have been 'objectively unreasonable.'"  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409).

Where the state court has not reached the merits of a petitioner's claim, then this Court will consider the claim under a *de novo* standard of review.

## II.   PETITIONER'S CLAIMS

### A.   Alleged Denial of a Meaningful Appeal

Underlying Petitioner's first claim is his contention that the trial judge improperly denied certain of his for-cause challenges to prospective jurors, forcing him to use his peremptory

---

[13] The Supreme Court has emphasized that "clearly established Federal law" refers only to the "'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of the relevant state-court decision.'"  *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); *see also Rodriguez v. Miller*, 499 F.3d 136, 140 (2d Cir. 2007) ("*Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions.").  Thus, a principle of constitutional law "grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot provide the basis for habeas relief.  *Id.* (citing *Musladin*).

challenges instead.  Petitioner does not argue that he was denied the right to an impartial jury, conceding that none of the jurors at issue in the Petition actually sat on the jury that convicted him.  (*See* Pet. Mem., at 6-10; *see also United States v. Martinez-Salazar*, 528 U.S. 304, 307, 317 (2000).)  Nor, in this habeas proceeding, does Petitioner directly challenge any of the trial court's rulings as to particular jurors.  Rather, Petitioner argues that he was denied due process and the equal protection of the laws when, through various procedural rulings, the state courts purportedly thwarted his efforts to obtain meaningful appellate review of the trial court's denial of his juror challenges.  Specifically, Petitioner argues that he was denied a meaningful appeal by a combination of:  (1) the trial court's denial of his application to have certain prospective jurors re-questioned on the record, after *voir dire* was initially conducted off the record (*see* Pet. Mem., at 90-94), (2) the Appellate Division's ruling that, at a post-trial reconstruction hearing, Petitioner bore the burden of proving that the jurors should have been excused for cause (*see id.* at 94-100), and (3) the Appellate Division's alleged failure to afford him a reasonable opportunity, either on direct or collateral review, to pursue his challenge to one particular prospective juror (Juror No. 2) (*see id.* at 101-09).

Petitioner's claim that he was denied a meaningful appeal implicates both due process and equal protection guarantees.  Although the federal Constitution does not require state criminal appellate review, *see Smith v. Robbins*, 528 U.S. 259, 270 n.5 (2000), a state that has established the right to criminal appeals must decide those appeals using procedures that "comport with the demands of [both] the Due Process and Equal Protection Clauses of the Constitution."  *Evitts v. Lucey,* 469 U.S. 387, 393 (1985) (quoting *Griffin v. Illinois,* 351 U.S. 12, 18 (1956)); *accord Simmons v. Reynolds*, 898 F.2d 865, 868 (2d Cir. 1990).

33

A state's criminal procedural rules violate due process if they "'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgress[] any recognized principle of fundamental fairness in operation.'" *DA's Office v. Osborne*, 129 S. Ct. 2308, 2320 (2009) (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)).[14]  Furthermore, under the Due Process Clause, the state courts must not "decide[] the appeal in a way that was arbitrary with respect to the issues involved." *Evitts*, 469 U.S. at 404.  The Supreme Court has, however, cautioned against the unwarranted expansion of constitutional guarantees "under the open-ended rubric of the Due Process Clause." *Medina*, 505 U.S. at 443.  The "category of [state] infractions that violate 'fundamental fairness'" under the Due Process Clause is "very narrowly" defined, *id.* (internal quotation marks and citations omitted), and the constitutional guarantee of due process, while critical to the criminal justice system, cannot transform the federal courts into "'a rule-making organ for the promulgation of state rules of criminal procedure.'" *Id.* at 443-44 (quoting *Spencer v. Texas*, 385 U.S. 554, 564 (1967)); *see also Goeke v. Branch*, 514 U.S. 115, 120 (1995) (recognizing "the States' ability to conduct appeals in accordance with reasonable procedural rules" (citations and internal quotations omitted)).

The Equal Protection Clause separately requires the state appeals system to be "free of unreasoned distinctions," *Rinaldi v. Yeager*, 384 U.S. 305, 310 (1966), and forbids the state from

---

[14]Although *Osborne* and *Medina* addressed the constitutionality of statutory criminal procedural rules, the same inquiry applies to common law criminal procedures.  *See Hines v. Miller*, 318 F.3d 157, 161-62 (2d Cir. 2003); *see also Martinez v. Cunningham*, 04 Civ. 3905 (PAC) (FM), 2006 U.S. Dist. LEXIS 64591, at *6 (S.D.N.Y. Aug. 16, 2006) (Report & Recommendation) (state appeals court's conduct violates due process only if the "alleged error was of such 'constitutional dimension' that it deprived him of 'fundamental fairness'" (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988)), *adopted by* 2006 U.S. Dist. LEXIS 77031 (S.D.N.Y. Oct. 23, 2006).

"'intentionally treat[ing a criminal appellant] differently from others similarly situated [without any] rational basis for the difference in treatment,'" *Siao-Pao v. Connolly*, 564 F. Supp. 2d 232, 245 (S.D.N.Y. 2008) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)); *see generally Acosta v. Giambruno*, 326 F. Supp. 2d 513, 524 (S.D.N.Y. 2004) (noting that "issues of due process are implicated when a defendant is denied an adequate opportunity to pursue his appeal, [or] fails to receive an adjudication on the merits," and further noting that a defendant may not be "treated differently in such a way as to stifle the pursuit of a meaningful appeal"). To prevail on a so-called "class of one" claim under the Equal Protection clause, "'the level of similarity between [the petitioner] and the persons with whom [he] compare[s himself] must be extremely high' . . . [and] the [petitioner] must show [both] that (1) 'no rational person could regard the circumstances of the [petitioner] to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy;' and (2) 'the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the [State] acted on the basis of a mistake.'" *Gryphon Dev. LLC v. Town of Monroe*, 08 Civ. 3252 (SHS), 2009 U.S. Dist. LEXIS 112650, at *12-13 (S.D.N.Y. Nov. 30, 2009) (citations omitted) (quoting *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 110 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008)).

Here, Petitioner cannot prevail on his claim that he was denied the right to a meaningful appeal, as none of the state court conduct he challenges, whether viewed individually or collectively, deprived him of that right. Each judicial ruling that Petitioner challenges comported with New York's procedural rules and precedent, and was neither fundamentally unfair nor irrational. Such conduct does not rise to the level of either a due process or an equal protection violation.

1.      **Denial of Petitioner's Request To**
        **Re-question Prospective Jurors on the Record**

Petitioner first complains about a procedural ruling that the trial judge made during *voir*

*dire*.  Prior to the commencement of *voir dire,* Petitioner did not request transcription of the *voir*

*dire* questions and answers.  After the judge denied certain for-cause challenges, however,

Petitioner asked if certain prospective jurors, who had been the subject of those challenges, could

be recalled and questioned again, in order to create a record to challenge the judge's rulings on

appeal.  (*See* Pet. Mem., at 90-91.)  The judge denied the request to re-question the jurors on the

record, and Petitioner argues that this unduly restricted his ability to create a full record for

review on appeal.[15]  (*See id.*)

It is undisputed that New York's criminal procedural system provides numerous

safeguards – some above and beyond those required by the Constitution – to protect criminal

defendants' rights to both an impartial jury and an adequate appeal.  For example, New York

gives defendants the ability to challenge jurors peremptorily, even though the federal

Constitution does not require the states to allow peremptory challenges.  *See United States v.*

*Martinez-Salazar*, 528 U.S. 304, 311 (2000) (no constitutional right to peremptory challenges).

The state also permits defendants to appeal from judges' denials of for-cause challenges, *see*

*generally* N.Y.C.P.L. § 450.10, another right not constitutionally required, *see Smith v. Robbins*,

_____

[15] It does not appear that Petitioner fully exhausted his claim challenging this ruling as a
violation of his due process right to a meaningful appeal.  Petitioner did raise this claim to the
Appellate Division in federal constitutional terms, in a brief he filed after the court-ordered
reconstruction hearing.  (*See* Pet. App. at 907.)  In his letter seeking leave to the Court of
Appeals, however, Petitioner never suggested that this ruling by the trial court constituted a
constitutional violation.  Rather, the claim he raised to the Court of Appeals was that the
Appellate Division had mis-allocated the burden of proof in the reconstruction hearing.  (*See* Pet.
App. at 1000-06.)  Even if unexhausted, however, this Court may deny Petitioner's claim if it
lacks merit.  *See supra* at 31; 28 U.S.C. § 2254(b)(2).

528 U.S. 259, 270 n.5 (2000).  Under New York law, where the state appellate court concludes

that a trial judge erred in denying a criminal defendant's for-cause juror challenge, the

conviction will be reversed if the defendant used all of his peremptory challenges, *see People v.*

*Braxton*, 277 A.D.2d 39 (1st Dep't 2000), as Petitioner did here.

 Moreover, in order to enable a criminal defendant to make a record for appeal, New York

also affords defendants the opportunity, if requested, to conduct the entirety of *voir dire* on the

record.  *See* N.Y. JUD. LAW § 295; *Walker v. Senkowski*, 769 F. Supp. 462, 464 n.3 (E.D.N.Y.

1991).  New York courts have held, however, that this state-law right may be waived, *see*

*People v. Harrison*, 85 N.Y.2d 794, 796 (1995) ("[v]erbatim recordation of the proceedings is

the 'better practice,' unless waived" (quoting *People v. Fearon*, 242 N.Y.S.2d 33, 34 (N.Y.

1963)), and Petitioner never suggests that the federal Constitution would prohibit such a waiver.

In this case, Petitioner, through counsel, chose not to request full transcription when *voir dire*

began (*see* Pet. App., at 31-33*; DeGondea I*, 682 N.Y.S.2d at 140), thereby waiving his right to

transcription.  It was only after the trial judge denied some of Petitioner's for-cause challenges

that counsel raised the issue, essentially proposing a "do over," on the record.  (*See* Pet. Mem., at

90-91.)  Petitioner cites no New York statute, case law, or rule of criminal procedure that would

have entitled him to such relief despite his waiver,[16] nor does he cite any specific federal

authority to demonstrate that such relief is compelled by the Due Process Clause.

Even examined in light of general due process principles that have been articulated by the

Supreme Court, the trial court's ruling here – implicitly finding that Petitioner had waived his

state-law right to transcription – did not violate principles of "fundamental fairness."  *See*

*Medina*, 505 U.S. at 443.  For one thing, the trial judge only denied Petitioner's request to recall

prospective jurors who had already been questioned, and permitted full transcription of

subsequent rounds of *voir dire* as soon as such transcription was actually requested.  (*See, e.g.*,

Trial Tr., at 107-125; Pet. App. at 948.)  Further, Petitioner himself argued on direct appeal that

the record was *sufficient* to enable the Appellate Division to review his claim as to the trial

court's denial of two of his for-cause challenges, even though the questioning as to those

prospective jurors had not been transcribed.  (*See* Pet. App. at 1024.)  Given that argument,

Petitioner is now hard-pressed to suggest that he suffered any substantial denial of his appellate

right as to those juror challenges.

Petitioner has also failed to demonstrate a violation of his equal protection rights, as he

has not shown that the trial judge intentionally treated him differently from others similarly

---

[16] Although Petitioner identifies a line of New York cases in which an incomplete transcript provided the basis for reversal of a defendant's conviction, all of those cases involved defendants who explicitly requested full transcription of the entire *voir dire* proceedings, but were denied that request, and thus none involved a question of waiver.  *See People v. Harrison*, 85 N.Y.2d 794, 797 (1995); *People v. Dennis*, 265 A.D.2d 271 (1st Dep't 1999); *People v. Fleming*, 221 A.D.2d 287 (1st Dep't 1995).  Petitioner also cites *People v. Alston*, 222 A.D.2d 294 (1st Dep't 1995), in which the court held that the defendant had no right to re-question jurors on the record when the parties and judge were in agreement as to what the juror said – thereby suggesting that re-questioning might be appropriate in the absence of such agreement, *see id.* at 295.  At most, this suggestion in *Alston* was *dicta* and does not demonstrate that the appellate court in Petitioner's case violated any established state procedural rule.

situated, without any rational basis for the difference in treatment. *See Village of Willowbrook*, 528 U.S. at 564. As explained above, the state courts have held that the right to have *voir dire* conducted on the record may be waived, and Petitioner has not suggested that he, unlike other criminal defendants, was singled out for enforcement of this waiver rule. It is also not inherently irrational for a trial court to decline a defendant's request to recall prospective jurors who have already been subjected to questioning, especially where, as in this case (which involved the killing of a police officer), the jury selection process can be expected to be lengthy.[17]

Finally, to the extent that Petitioner argued on appeal, in the alternative, that the record was *insufficient* and that his right to appeal was thereby impeded, the Appellate Division *agreed* with him. Finding that Petitioner's ability to create a record had been effectively thwarted, the court ordered the trial court to conduct a reconstruction hearing. *See DeGondea I*, 682 N.Y.S.2d at 140. The state rules did not require a reconstruction hearing as to the portion of the *voir dire* to which the Petitioner had waived his right to transcription, *see People v. Akili*, 289 A.D.2d 55, 56 (1st Dep't 2001) (holding that, where *voir dire* was not fully transcribed, defendant was not entitled to a reconstruction hearing), so it is apparent that the court exercised its discretion in this case to take additional steps to ensure a fair hearing of Petitioner's asserted claims regarding the prospective jurors who had purportedly said that they could not be fair. The reconstruction hearing was then held and resulted in a record that both the trial court and the Appellate Division found was adequate to enable review of the juror challenges that Petitioner had raised on his appeal. (*See* Pet. App., at 836 ("the evidence before this court has created an adequate record for appellate review"); *DeGondea II*, 705 N.Y.S.2d at 22 (reconstruction hearing record provided

---

[17] In Petitioner's case, *voir dire* commenced on November 2, 1994 (*see* Pet. Mem., at 6), and did not end until November 9 (*see* Trial Tr. at 145, 171).

adequate grounds for deciding Petitioner's claim on the merits).)  Petitioner did not challenge that finding.

Under all of these circumstances, Petitioner has not demonstrated that the trial court's denial of his request to re-question prospective jurors deprived him of a meaningful appeal, so as to violate his due process or equal protection rights.  Certainly, Petitioner has not shown that the Appellate Division's decision on his claim – *i.e.,* its *acceptance* of Petitioner's argument and its resulting decision ordering a reconstruction hearing to amplify the record – was contrary to, or an unreasonable application of federal law, so as to justify habeas relief.  *See* 28 U.S.C. § 2254(d).

### 2.  The Appellate Division's Ruling That Petitioner Bore the Burden Of Proof At The Reconstruction Hearing

Petitioner next challenges the Appellate Division's decision holding that, at the reconstruction hearing, Petitioner bore the burden of proving that the trial judge had erred in denying certain for-cause challenges to prospective jurors.

The Appellate Division had ordered the reconstruction hearing so as to amplify the record regarding the *voir dire* of two prospective jurors – Jurors Nos. 5 and 11.  After allocating to the State the burden of proof on the question of whether the trial court had erred in denying the for-cause challenges at issue, the judge who presided at the reconstruction hearing considered the evidence that had been presented and determined that the State had failed to establish that Juror No. 5 ever affirmatively stated that he could render a fair and impartial verdict in Petitioner's case.  (*See* Pet. App., at 841-47.)  The Appellate Division, however, affirmed Petitioner's conviction, holding that *Petitioner* should have been assigned the burden of proof on the question of whether the juror had expressed bias, and that, in view of the evidence

as a whole, Petitioner had failed to carry his burden.  *See DeGondea II*, 705 N.Y.S.2d at 21-22.

Petitioner then sought leave to appeal to the Court of Appeals, challenging on due process

grounds the Appellate Division's ruling as to the proper allocation of the burden of proof.  (Pet.

App., at 1064-65.)  The Court of Appeals denied Petitioner's application for leave to appeal

without opinion.  *See People v. DeGondea*, 95 N.Y.2d 834 (N.Y. 2000).[18]

      With respect to burdens of proof, "'it is normally within the power of the State to

regulate procedures under which its laws are carried out, including the burden of producing

evidence and the burden of persuasion, and [the State's] decision in this regard is not subject to

proscription under the Due Process Clause unless it offends some principle of justice so rooted in

the traditions and conscience of our people as to be ranked as fundamental . . . [or] transgresses

any recognized principle of 'fundamental fairness' in operation.'"  *Medina v. California*, 505

U.S. 437, 445, 448 (1992) (quoting *Patterson v. New York*, 432 U.S.197, 201-202 (1977))

(internal quotation marks and citations omitted).  Here, Petitioner has again failed to make the

requisite showing to establish a constitutional violation.

      Petitioner cannot point to a traditional "principle of justice" – or any rule, regulation or

precedent at all – that was violated by the Appellate Division's decision.  To the contrary,

Petitioner's letter seeking leave to appeal to the Court of Appeals explicitly stated that the

particular burden of proof issue presented by the appeal was an "important question[] of first

_____

     [18] It is unclear whether Petitioner's letter to the Court of Appeals was sufficient to
exhaust this claim.  Since Petitioner prevailed on the burden of proof issue before the
reconstruction court, he did not raise this issue before the Appellate Division.  (*See* Pet. App., at
858-910.)  In such a situation, it is unclear whether an application for leave to appeal to the
Court of Appeals is sufficient to exhaust the available state court remedies.  *Cf. Lurie v. Wittner*,
228 F.3d 113, 124 (2d Cir. 2000) ("[p]resenting a claim for the first time to a state court of
discretionary review is insufficient to exhaust the claim unless the court considers it.") Yet,
regardless of whether this claim is exhausted, it should be denied because it lacks merit.

impression." (Pet. App., at 1000.) As Petitioner himself described the prior state law as

unsettled (*see id.* at 1004), and now points to no Supreme Court holding to demonstrate that the

Appellate Division's decision was contrary to or an unreasonable application of federal law, he

cannot prevail under AEDPA. Under *Carey v. Musladin,* 549 U.S. 70 (2006) (*see supra* n.13), it

is not sufficient for Petitioner merely to argue in this proceeding that "considerations of

convenience and fairness" (as opposed to controlling Supreme Court law) required the People to

bear the burden (*see* Pet. Mem., at 96).[19]

 In fact, to the extent the Supreme Court has actually addressed burdens of proof on

matters collateral to a criminal trial, the Court's holdings suggest that Petitioner is significantly

overreaching in his effort to portray the Appellate Division's decision as a due process violation.

In *Medina v. California*, 505 U.S. 437 (1992), the petitioner challenged a state law requiring a

criminal defendant to bear the burden of proving that he was incompetent to stand trial. *Id.* at

439-40. Upholding the state requirement, the Supreme Court observed that, "[o]nce a State

provides a defendant access to procedures for making a competency evaluation, . . . we perceive

no basis for holding that due process further requires the State to assume the burden of

vindicating the defendant's constitutional right by persuading the trier of fact that the defendant

is competent to stand trial." *Id.* at 449. Thus, even though state law implicated a federal

constitutional protection, the Court nevertheless held that due process did not "require a State to

adopt one procedure over another on the basis that it may produce more favorable results to the

accused." *Id.* at 451. Here, where Petitioner's right to an impartial jury was at issue, and New

---

 [19] The Court also notes that, in the absence of consistent precedent regarding the proper
allocation of the burden of proof, Petitioner can have no viable equal protection claim, as he
cannot show that the state courts had consistently applied one rule to others similarly situated,
and then applied a different rule to him.

York had already afforded Petitioner the procedural protections of (1) the right to the transcript of the entire *voir dire* proceedings on request (a right which, as discussed above, Petitioner waived), (2) the right to raise on appeal the trial court's determinations as to whether prospective jurors should have been excused for cause, and (3) the benefit of a reconstruction hearing to ensure a full record for appeal, the Due Process Clause did not "further require[] the State to assume the burden of vindicating [Petitioner's] constitutional right."  *Id.* at 449.[20]

There is thus no basis for this Court to find that the Appellate Division's ruling regarding the burden of proof at the reconstruction hearing violated Petitioner's due process rights, much less that the court's decision was contrary to, or an unreasonable application of federal law, under the relevant AEDPA standard of review.  28 U.S.C. § 2254(d).

### 3.   Petitioner's Alleged Inability To Appeal the Trial Court's Denial of His For-Cause Challenge To Juror No. 2

Petitioner's final argument regarding the alleged denial of his right to appeal relates to the state court's treatment of his various attempts to raise questions about the impartiality of prospective Juror No. 2.  During *voir dire,* Petitioner requested that this prospective juror be excused for cause, but the trial court denied the request, leading Petitioner to exercise a peremptory challenge to remove the juror.  Petitioner contends that, by way of two different

---

[20] Petitioner also argues that, by failing to accord sufficient deference to the factual findings made by the reconstruction court, the Appellate Division "ignored established precedent to uphold this conviction."  (Pet. Mem at 99.)  To the extent Petitioner is arguing a constitutional violation on this ground, he has failed to demonstrate state conduct warranting relief under either the Due Process or Equal Protection Clause.  The Appellate Division, in this case, considered the factual findings made by the reconstruction judge, but reached a different conclusion based on a different allocation of the burden of proof.  *See DeGondea II*, 705 N.Y.S.2d at 21-22.  This decision was neither arbitrary, irrational, nor fundamentally unfair.  Furthermore, under AEDPA, this Court must defer to the Appellate Division's factual findings in the absence of a clear and convincing showing of factual error, *see* 28 U.S.C. § 2254(e)(1), and Petitioner has failed to make such a showing.

rulings, taken together, the Appellate Division effectively denied him the opportunity for appellate review of the trial judge's refusal to excuse this juror for cause. (*See* Pet. Mem., at 101-09.)

The first ruling in question was the Appellate Division's denial of Petitioner's request to order the release of information about prospective Juror No. 2, for use in the reconstruction hearing that the court had already ordered in connection with the claim raised by Petitioner on direct appeal. In that claim, as noted above, Petitioner had alleged that the trial court committed error by failing to excuse two prospective jurors (Nos. 5 and 11) for cause. Petitioner had *not* raised a similar challenge on appeal with respect to the court's ruling as to Juror No. 2. (*See* Pet. App., at 191-92.) During the course of the reconstruction hearing, however, evidence was elicited that, according to Petitioner, "raise[d] significant questions about the propriety of the [trial] court's ruling denying the for-cause challenge to prospective juror [no.] 2." (Pet. App., at 192.) In light of that evidence, Petitioner requested, pursuant to Section 509(a) of the New York Judiciary Law, that the Appellate Division direct the release of contact information regarding prospective Juror No. 2, so that Petitioner could call him as a witness during the on-going hearing. (*Id*. at 193.)[21] Petitioner contends that the Appellate Division's denial of this request for the release of information unfairly impeded his ability to develop an adequate record for review with respect to Juror No. 2.[22]

The second ruling now challenged by Petitioner was the Appellate Division's reversal of the post-conviction relief granted to Petitioner by the trial court pursuant to Section 440.10 of the

---

[21] *See supra* n.5.

[22] For purposes of habeas review, Petitioner has adequately exhausted his challenge to this ruling of the Appellate Division. (*See* Pet. App., at 906-10; *id.* at 1005 n.1.)

New York Criminal Procedure Law.  Some time after the Court of Appeals denied him leave to appeal from the affirmance of his conviction, Petitioner moved collaterally before the trial court to vacate his conviction on the three grounds set out above.  (*See supra* at 22-23.)  The trial court granted Petitioner's motion on the particular ground that the trial judge had been inattentive, finding that this error was not harmless because it had led to the court's erroneous denial of Petitioner's motion to excuse Juror No. 2.  The Appellate Division, however, reinstated Petitioner's conviction, finding, under N.Y.C.P.L. § 440.10(3)(a), that Petitioner had "unjustifiably failed to use due diligence to cause the matter of the trial judge's somnolence or inattention 'to appear on the record in a manner providing adequate basis for [appellate] review.'"  *DeGondea III*, 769 N.Y.S.2d at 497 (quoting N.Y.C.P.L. § 440.10(3)).  The court also noted that any direct claim of error as to Juror No. 2 should have been raised by Petitioner on direct appeal, and thus was not properly the subject of review under Section 440.10.  *See id.* at 496.[23]  Petitioner now argues that, because the Appellate Court denied him the opportunity to question Juror No. 2 in the reconstruction hearing ordered by the court on direct appeal, the Appellate Division's later ruling that he also could not raise the matter collaterally effectively deprived him of any avenue to obtain appellate review of his claim of error as to that prospective juror.[24]

---

[23] The Court of Appeals denied Petitioner leave to appeal from this decision of the Appellate Division (*see* Pet. App., at 1879-80; *People v. DeGondea*, 781 N.Y.S.2d 297 (N.Y. 2004)), and thus this claim is also independently exhausted for purposes of this proceeding.

[24] When the People appealed the trial court's order vacating Petitioner's conviction under Section 440.10, Petitioner's opposition brief argued that his federal due process and equal protection rights would be violated "[i]f the People succeed in raising a procedural bar to [Section 440] relief here, [because Petitioner] will have been deprived of any New York forum in which to challenge [the trial judge's] misconduct."  (Pet. App., at 1813.)  The Appellate Division rejected Petitioner's argument and granted the People's appeal.  (*See* Pet. App., at

Even viewed in combination, the challenged rulings once again do not constitute a violation of due process or equal protection.

### a.   Denial of Motion To Release Juror Information

Petitioner seems to suggest that the Appellate Division first ruled that he could not challenge the trial court's *voir dire* ruling as to Juror No. 2 on direct appeal, and then ruled that he could not challenge the ruling in a collateral post-conviction proceeding, leaving him no means to raise his claim of error.  In actuality, though, the Appellate Division never faced, and thus never rejected, any direct appeal of Petitioner's claim as to Juror No. 2.  Petitioner simply never raised the claim on his direct appeal.

Rather, as set forth above, on his direct appeal, Petitioner challenged the trial court's *voir dire* rulings only as to prospective Jurors Nos. 5 and 11.[25]  Even in the face of additional evidence that was purportedly adduced at the reconstruction hearing, Petitioner never sought leave to expand the scope of his appeal to add a claim directed to the trial court's *voir dire* ruling as to Juror No. 2.  Instead, Petitioner only requested the release of Juror No. 2's contact information, so that he could be called as a witness at the hearing.  (*See* Pet. App., at 192-93.) Indeed, at the time, Petitioner told the reconstruction court that he was not seeking to reopen the appeal to include additional claims (*see* Pet. App., at 631-32), but rather hoped to call Juror

---

1832-64.)  Petitioner reiterated this argument in his leave letter to the Court of Appeals (*see* Pet. App. at 1879-80), and thus, to the extent he now claims that his constitutional rights were violated by a combination of the Appellate Division's rulings, he has exhausted such a claim for the purposes of habeas review.

[25] Although, at one point in his appellate brief, Petitioner generally referred to his "numerous requests to question the prospective jurors on the record," that brief cannot be reasonably construed to raise claims challenging the trial judge's rulings regarding any jurors other than Jurors Nos. 5 and 11.  (*See* Pet. App., at 83-87 (point heading asserting that "the court committed reversible error by refusing to grant two of counsel's for-cause challenges of prospective jurors who said that they could not be fair . . . .").)

46

No. 2 as a witness at the hearing in order to acquire additional "testimony that shows whether the judge was carefully considering what the jurors were saying throughout the course of voir dire" (*id.* at 631). Petitioner explained, "All I'm trying to do is get a witness so we can create a complete record." (*Id.* at 632.) Although Petitioner stated that he might later try to expand the appeal based on Juror No. 2's testimony (*see id.*), he told the court that the present purpose of his request for Juror No. 2's contact information was to "try[] to get more evidence that's relevant in some way to [Juror Nos. 5 and 11]'s excusal[s]" (*id.*). Thus, in denying Petitioner's motion, the Appellate Division merely declined to order the release of confidential information about a juror who was not then the subject of a party's appeal. (*See id.* at 200.)

Following completion of the reconstruction hearing, Petitioner submitted a supplemental brief to the Appellate Division in which he again argued that, "as a matter of fairness and due process," he should have been allowed "access to identifying information of this juror [No. 2] so that he could be called as a witness during the reconstruction hearing." (*Id.* at 859.) Again, Petitioner did not request that the Appellate Division consider the merits of the trial judge's refusal to strike Juror No. 2, but rather sought to have the matter remanded to the reconstruction court for additional fact-finding (with Juror No. 2 as a witness). (*See id.* at 907.) Accordingly, in considering Petitioner's direct appeal, the Appellate Division was not faced with the question of whether prospective Juror No. 2 should have been excused for cause.

Seen in this light, it cannot be said that the Appellate Division ruling that Petitioner now challenges was violative of due process. There was nothing arbitrary or fundamentally unfair about the Appellate Division's denial of Petitioner's request to provide confidential information about a prospective juror, so that the juror could be called to testify at a hearing that did not concern that juror's ability to serve. Juror No. 2's testimony had limited, if any, probative value

47

with respect to the claims that were actually before the court, and the arguments set forth in the People's opposition to Petitioner's motion – in particular, that the appeal, as framed, did not warrant intrusion on Juror No. 2's personal privacy (*see* Pet. App., at 195-96) – provided a rational ground upon which to deny Petitioner's request that this juror's contact information be released.

Thus, while Petitioner contends on habeas that "[t]here is no regularly applied procedural rule barring expansion of the issues to be considered during a reconstruction hearing" (Pet. Mem., at 106), the flaw in his argument is that he has failed to establish either that he ever *asked* for the issues on his appeal to be expanded, or that any rule prohibited the Appellate Division from taking the course of action that it took in denying the type of request that Petitioner actually made.[26]

Petitioner has also failed to demonstrate that it would have been futile for him to have raised his claim regarding Juror No. 2 on direct appeal, or to have requested leave to expand his existing appeal so as to raise that claim.  While Petitioner suggests that the *voir dire* record was inadequate to enable him to raise his claim of error at to Juror No. 2 on direct appeal (*see* Pet.

---

[26] Petitioner cites *People v. Fernandez*, 183 A.D.2d 605 (1st Dep't 1992), *aff'd*, 81 N.Y.2d 1023 (1993), as purportedly recognizing a party's right to expand the scope of a reconstruction hearing.  (*See* Pet. Mem., at 105-06.)  The decision in that case, however, merely recognized that courts could expand reconstruction hearings to cover additional claims that were already the subject of a direct appeal, *see Fernandez*, 183 A.D.2d at 606-07, which was not the situation here.  Petitioner's further citation to *Tankleff v. Senkowski*, N.Y.L.J., Nov. 12, 1998, at 30 col. 2 (N.Y. Sup. Ct. Suffolk County) (*see* Pet. Mem., at 106), likewise does not support Petitioner's argument that the Appellate Division was required to authorize release of the juror information he requested.  In that case, the petitioner raised a *Batson* challenge to only two jurors, and the reconstruction court, in its discretion, permitted a third juror (who had served as an alternate at trial) to be questioned during the reconstruction hearing "[f]or the sake of a 'complete' record."  *Tankleff*.  Yet, even then, the reconstruction court made clear that the third juror "did not enter into . . . [its] final determination."  *Id.*

48

Mem., at 101-02), it is difficult to conclude that such a claim would have necessarily been dismissed by the Appellate Division on that basis, given that the Appellate Division found the *voir dire* record inadequate to consider Petitioner's claims as to Jurors Nos. 5 and 11, but nevertheless ordered a reconstruction hearing, so that those claims could be addressed.  It is similarly difficult for this Court to conclude that, had Petitioner sought to expand the reconstruction hearing in conjunction with a request to amend his actual appeal, his application would necessarily have been denied.  Petitioner's speculation as to what the court would have done in such circumstances cannot provide the basis for a claim of a due process or equal protection violation.

### b.    Denial of Section 440.10 Relief

Petitioner also cannot prevail on his claim that the Appellate Division deprived him of a meaningful appeal by holding, in its decision on his Section 440.10 motion, that his claim regarding Juror No. 2 should have been raised on direct appeal, and thus could not be reviewed in a collateral proceeding.  *See DeGondea III*, 769 N.Y.S.2d at 496 (noting that "any claim of error relating to Juror No. 2 would be barred from consideration as an independent ground for vacating the judgment [under Section 440], since such issue could have been considered on direct appeal, as were the issues relating to Jurors Nos. 5 and 11" (citing N.Y.C.P.L. 440.10(2)(c))).  While this decision may have been frustrating for Petitioner, who may have been operating on the belief that the claim was more appropriately raised on a Section 440.10 motion, it does not afford Petitioner a basis for habeas relief.

Quoting *Evitts*, 469 U.S. at 395 n.6, Petitioner argues that the state may not set up appellate procedures that have the effect of preventing a criminal defendant from "obtain[ing] a decision at all . . . on the merits of the case."  (Pet. Mem., at 106-07.)  Yet Petitioner exaggerates

49

the scope of *Evitts*, which addressed the safeguards necessary to ensure that a litigant's indigence would not prevent him from securing meaningful appellate review.  *See Evitts*, 469 U.S. at 396 (recognizing constitutional right to effective appellate counsel).  Contrary to Petitioner's position, *Evitts* does not stand for the proposition that state appellate courts, on collateral review, must reach the merits of a claim that the court finds to be procedurally barred because it could have been raised on direct appeal.

Moreover, Petitioner has not demonstrated that the Appellate Division's determination that his claim was appropriate for review on direct appeal, and thus was barred from collateral review, was itself fundamentally unfair or irrational.  On the facts presented, the Appellate Division had a rational basis for applying Section 440.10(2)(c), which bars collateral consideration of claims capable of being raised on direct appeal.  As discussed above, Petitioner did raise his claims regarding Jurors Nos. 5 and 11 on direct appeal, despite an incomplete record, and the record regarding Juror No. 2 was not substantially less complete than the record regarding those other two jurors.  (*See* discussion *supra* at 46-49.)

In any event, the Appellate Division would have had discretion to deny Petitioner's claim under Section 440.10(3)(a), which, as noted above, permits the denial of a Section 440.10 motion where the matter "could with due diligence by the defendant have readily been made to appear on the record," but where the defendant "unjustifiably failed to adduce such matter prior to sentence."  N.Y.C.P.L. § 440.10(3)(a).  Although, during *voir dire,* Petitioner's counsel made some effort to place on the record the facts as to what had transpired in the questioning of Juror No. 2, he never attempted to memorialize any of the details of Juror No. 2's purported statements regarding his views on society (*i.e.,* that it was too liberal regarding drug crime), or that murder could never be justified.  He also provided the Appellate Division with little justification for

having failed to make a further record.  Further, as emphasized by the court, Petitioner waited a

substantial time – six years after his sentencing – before attempting to raise any matter regarding

Juror No. 2 on a Section 440.10 motion.  Under these circumstances, the Appellate Division's

denial of Petitioner's claim regarding Juror No. 2 on procedural grounds was not constitutionally

infirm.

      Finally, the Court notes that, to the extent Petitioner may be contending that there were

procedural errors in the state courts' conduct of the Section 440.10 proceedings, such errors have

been held to be non-cognizable on federal habeas review.  *See, e.g., Jones v. Duncan*, 162 F.

Supp. 2d 204, 217-19 (S.D.N.Y. 2001) ("While the Second Circuit has not directly addressed

this issue, district court decisions within the Circuit (several of which have been affirmed by the

Second Circuit) have followed [this] majority rule."); *see also McBean v. Warden*, No. 9:08 Civ.

0150 (LEK), 2008 U.S. Dist. LEXIS 99444, at *63 (N.D.N.Y. Dec. 9, 2008) ("[T]o the extent

that [p]etitioner is challenging alleged procedural errors by the trial court in deciding his section

440 motion . . . , those claims are not cognizable on habeas review."); *Diaz v. Greiner*, 110 F.

Supp. 2d 225, 235-36 (S.D.N.Y. 2000); *Franza v. Stinson*, 58 F. Supp. 2d 124, 151 (S.D.N.Y.

1999).  "Federal courts may upset a State's postconviction relief procedures only if they are

fundamentally inadequate to vindicate the substantive rights provided," *DA's Office v. Osborne*,

129 S. Ct. 2308, 2320 (2009), and Petitioner has made no showing that this was the case here.

      Thus, with respect to each of the rulings that are the focus of Petitioner's claim that he

was denied a meaningful appeal, Petitioner has failed to demonstrate that the state courts acted in

a manner that violated clearly established federal law, *see* 28 U.S.C. § 2254(d), and Petitioner's

first habeas claim should be dismissed accordingly.

**B.**     **Challenge To the Jury Charge**

For his second habeas claim, Petitioner asserts that the trial court violated his right to due process by omitting a particular instruction from the court's jury charge.  While the trial court charged the jury as to self-defense, the court declined to instruct the jury that a person's use of force may also be justified to prevent bodily harm to a third party.  On Petitioner's direct appeal, the Appellate Division held that the trial court's omission of this jury instruction was harmless error.  As the Appellate Division's finding of harmless error was appropriate under federal law, Petitioner's challenge to the jury charge should be dismissed under AEDPA.[27]

In order to obtain a writ of habeas corpus based on an erroneous jury instruction, a petitioner must establish that the erroneous instruction violated a right guaranteed him by federal law.  *See Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001); *Sams v. Walker*, 18 F.3d 167, 171 (2d Cir. 1994).  To do so, a petitioner bears the burden of establishing that the jury instruction was not only erroneous, but it  "so infect[ed] the entire trial that the resulting conviction[] violated due process."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quotation marks and citation omitted).  Moreover, as "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law," a petitioner's burden of demonstrating a

_____

[27] This claim – regarding the trial court's alleged failure to instruct the jury fully on "justification" – is exhausted for the purposes of habeas review.  Petitioner raised the claim on his direct appeal, by arguing to the Appellate Division that the trial court's "refusal to charge every prong of the justification defense supported by the evidence, denied appellant due process" under the 14th Amendment.  (Pet. App., at 87-88.)  Then, in his application for leave to appeal to the Court of Appeals, Petitioner again argued that "[a]s a matter of . . . federal due process[,] a criminal defendant is entitled to an instruction 'as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.'"  (*Id.* at 1008 (quoting *Matthews v. United States*, 485 U.S. 58, 63 (1988)).)

constitutional violation is "especially heavy" where the petitioner is challenging the trial court's failure to give a particular instruction.  *Id.*

Further, where this Court reviews this type of claim under AEDPA, even the Court's finding of a constitutionally defective jury charge does not end the inquiry.  Rather, at that point, the Court must also inquire as to whether the state court's denial of the petitioner's constitutional claim was contrary to, or constituted an unreasonable application of federal law, as stated by the Supreme Court.  *See Jackson v. Edwards*, 404 F.3d 612, 621, 621 (2d Cir. 2005) (finding, under AEDPA, that where habeas petitioner challenged the trial court's failure to give a "justification" charge, habeas should only be granted where the court could resolve three questions in the petitioner's favor:  "First, was he entitled to a justification charge?  Second, if so, did the failure to give one result in a denial of due process?  Third, if so, did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law?" (citing *Davis*, 270 F.3d at 124; 28 U.S. C. § 2254)).

### 1.     <u>Petitioner Was Entitled To the Justification Charge.</u>

In this case, construing the evidence in the light most favorable to Petitioner, *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990), there is little doubt that Petitioner was entitled to the justification charge that he sought at trial.  Under New York law, a person may use deadly physical force to protect a third person from another whom he "reasonably believes . . . is using or about to use deadly physical force . . . or attempting to commit a . . . robbery."  N.Y. PENAL LAW § 35.15(1), 35.15(2).

There was more than sufficient evidence to support this instruction.  In particular, Petitioner testified at trial that he "walk[ed] up towards the front of the store" because he "heard somebody being attacked at the front door."  (Pet. Mem., at 116.)  Then, Petitioner testified, he

saw Lopez holding a gun, he saw Lopez swing that gun toward Arce, and he heard Lopez tell Arce to "give him the [stuff]." (*Id.*)  At that moment, Petitioner drew his gun and shot Lopez. (*See id.*)  Neither party disputes that there was ample evidence that Officer Lopez's gun was pointed at Petitioner's accomplice Arce, at the time Petitioner shot Lopez.  At summation, in fact, the People argued that Petitioner was not entitled to a verdict based on self-defense because Lopez was aiming at Arce, not at Petitioner.  (Pet. Reply at 22.)  Contrary to Respondent's arguments otherwise (*see* Resp. Mem., at 108-09), a justification charge is appropriate even where it is the People's narrative – as opposed to the criminal defendant's narrative – that more strongly suggests the pertinent charge.  *See People v. Steele*, 26 N.Y.2d 526, 528-29 (N.Y. 1970) (holding that justification charge was required where "the prosecution's case, viewed separately, warrants the requested charge").

Respondent further argues that two key deficiencies in the evidence would have rendered the third party defense instruction inappropriate.  First, Respondent argues that no third party justification defense would have been available because Petitioner could not have seen his associate Arce at the time of the shooting.  (*See* Resp. Mem., at 107-08).  This argument fails because, regardless of whether Petitioner could actually see Arce, there was sufficient evidence that Petitioner believed that Lopez was threatening someone who was Petitioner's associate.  In particular, Petitioner testified that he could see Lopez swing his gun towards someone else and tell that person to "give him the [stuff]."  (Pet. Mem., at 116.)  Even without visual confirmation that Arce was Lopez's target, Petitioner's perception supports his purported belief that one of his associates was in danger.[28]  Next, Respondent argues that the third party justification charge

---

[28] Respondent does not appear to dispute that Petitioner could see and hear Lopez.

would have been inappropriate because Petitioner never explicitly testified that he feared for his accomplices' lives, but rather testified only that he believed they were being robbed and that he feared for his own life.  (*See* Resp. Mem., at 108).  Respondent's position sets too high a bar for this justification defense, which permits a person to use physical force "when and to the extent he . . . reasonably believes such to be necessary to defend . . . a third person."  N.Y. PENAL LAW § 35.15(1).  Petitioner need not have testified that he "feared for" the life of his accomplices, as Respondent contends, but merely that he had a reasonable belief that he had to use deadly force to save their lives.  The evidence presented, when viewed in the light most favorable to Petitioner, supports such a reasonable belief.  *See Blazic*, 900 F.2d at 534 (2d Cir. 1990)

Based on the evidence presented at trial, the Appellate Division appropriately determined (1) that Petitioner had a potential defense that his actions were justified in defense of a third party, and (2) that the trial court erred in failing to instruct the jury as to that defense.  *See DeGondea II*, 705 N.Y.S.2d at 22 ("the court's refusal to charge justification in defense of a third person was harmless error").  Nothing in the trial record, nor any of Respondent's arguments opposing the present Petition, suggests any reason for this Court to question the Appellate Division's conclusion that the trial judge should have given the jury this justification instruction. *See Davis v. Strack*, 270 F.3d 111, 123-24 n.4 (2d Cir. 2001) ("In determining whether a petitioner was entitled to a defense under state law, federal courts must . . . defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional.").  The Appellate Division also appropriately found, however, that the trial court's error, in this instance, was harmless.  *See DeGondea II*, 705 N.Y.S.2d at 22-23.

## 2.      Omission of This Justification Charge Was Harmless Error.

To warrant habeas relief, a jury charge error must be "sufficiently harmful to make the conviction unfair." *Jackson*, 404 F.3d at 624 (quoting *Davis*, 270 F.3d at 124).  Thus, while a trial court's failure to instruct the jury as to a defense on which the defendant has "a significant possibility of prevailing" can have "catastrophic" consequences to the defendant and hence rise to the level of a due process violation, *Davis*, 270 F.3d at 132, where a jury charge error would not have altered the jury's verdict, there can be no such violation, and habeas must be denied, *see Blazic*, 900 F.2d at 542-43 (rejecting petitioner's contention that the omission of a justification charge "so infected the entire trial that the resulting conviction violate[d] due process" because the Court "perceive[d] no basis to conclude that a jury would have responded differently had the charge been given").

In this case, given the factual findings inherent in the jury's verdict, Petitioner could not have prevailed on his justification defense, even if a proper instruction as to that defense had been given.  This is because, under New York law – as the trial court correctly instructed the jury – "[a] person may not use physical force to resist an arrest, whether authorized or unauthorized, which is being effected or attempted by a police officer . . . *when it would reasonably appear that the latter is a police officer . . . .*"  N.Y. PENAL LAW § 35.27.  In other words, regardless of whether a use of force may be otherwise justified, justification is not available as a defense when it "reasonably appear[ed]" to the defendant that the person against whom he was using that force was an officer attempting to effect an arrest.  Here, one of the elements of the crime of first-degree murder, of which Petitioner was convicted, was that Petitioner "knew or reasonably should have known that the intended victim was a police officer" N.Y. PENAL LAW § 125.27(1)(a)(i); *see also* Trial Tr., at 2399m-2399n (judge telling the jury

that, to convict Petitioner of first-degree murder, "you must be satisfied beyond a reasonable doubt . . . that [t]he defendant Degondea knew or reasonably sh[o]uld have known that Luis Lopez was a police officer").)  In convicting Petitioner of this offense, the jury necessarily found that Petitioner knew or, at a minimum, "reasonably should have known" that he was shooting at a police officer.  Thus, *a fortiori,* the jury could not have found that Petitioner's conduct was "justified."

Petitioner argues that the language of Section 35.27 of the New York Penal Law is sufficiently different from the language of Section 125.27 to allow for a reading by which, despite the jury's verdict, he could have prevailed on his justification defense.  Essentially, Petitioner suggests that the jury could have determined, based on the overall context of the incident (including the fact that police radios could be heard and that Lopez was accompanied into the room by others with visible shields), that Petitioner "should have known" that Lopez was a police officer, even when (based on Lopez's plainclothes and alleged failure to show his own badge) Lopez did not, himself, "reasonably appear" to be an officer.  (*See* Pet. Mem., at 117-20, 124.)  Section 35.27, however, is not, as Petitioner would have it, framed in terms of an officer's "personal" appearance (*see id.* at 119 (arguing that the jury may have "determined that Lopez did not *personally* appear to be a police officer" (emphasis added))), but rather is framed more broadly (*see* N.Y. PENAL LAW § 35.27 (making force impermissible "when it would reasonably appear" that the victim is a police officer)).

On the evidence presented at Petitioner's trial, the only bases on which the jury could have found that Petitioner knew or reasonably should have known that Lopez was a police officer involved events at the scene of the shooting:  the fact that Lopez was accompanied by five others individuals holding police shields and radios during a drug bust, and the fact that

those individuals made no attempt to arrest Lopez, even though he had drawn a gun.  If these events reasonably should have led Petitioner to know that Lopez was an officer, then the same events, necessarily, must have made it "reasonably appear" that Lopez was an officer.

Petitioner also points to the "excessive force" exception to Section 35.27 as an additional ground upon which the jury could have accepted his justification defense, despite the jury's finding that Petitioner should have known that Lopez was a police officer.  Although Section 35.27 prohibits the use of force to resist arrest, an exception permits the use of justifiable force to resist excessive police force.  *See People v. Alston, 104 A.D.2d* 653 (justification defense is appropriate if "the defendant was the victim of an unprovoked police attack[] or excessive force"); *People v. Carneglia*, 63 A.D.2d 734, 735 (1st Dep't 1978) (where defendant was "the victim of . . . [a police officer's] use of excessive physical force in effectuating an arrest, [the defendant] is entitled to a charge that reasonable acts of self-defense are justifiable"); *see also* Pet. App., at 120.  Petitioner contends that, in light of this exception, a reasonable jury could have found that Petitioner justifiably shot Lopez to "resist" what Petitioner perceived to be an excessive use of force directed to Petitioner's associate.  (*See* Pet. App., at 120.)  This argument, however, must also fail.

The cases cited by Petitioner all indicate that New York's "excessive force" exception permits the use of justifiable force to resist excessive police force *against oneself;* Petitioner cites no precedent to support the view that this exception may apply in the context of force used against a third party (*see* Pet. Reply at 23 (arguing that "it is undisputed that . . . a defendant can resist excessive police force to defend another," but failing to cite any authority to support this proposition)), and this Court has found none.  Petitioner also offers no principled reason why this

Court should extend state law in a manner that has not been set forth by the state courts, which is not the province of the federal court on habeas review.

For all of the above reasons, while the trial court should have charged the jury with the justification charge Petitioner requested, Petitioner has not shown a significant possibility that he could have prevailed on that defense, had the charge been given.  To the contrary, the findings inherent in the jury's verdict lead this Court to conclude that Petitioner would have been convicted, regardless of the trial court's error.  Under these circumstances, it is difficult to see how Petitioner's trial was so tainted with error as to have been rendered fundamentally unfair, and thus to have violated Petitioner's right to due process.  *See Jackson,* 404 F.3d at 624-25 (identifying the due process inquiry as "whether the trial court's refusal to give the justification instruction 'so infected the entire trial that the resulting conviction violates due process'" (quoting *Cupp v. Naughten,* 414 U.S. 141, 147 (1973))).  Moreover, as Petitioner has failed to show that he suffered any "actual prejudice" from the trial court's failure to give the justification charge, the Appellate Division's conclusion that the trial court's error was harmless was correct, "and certainly not 'objectively unreasonable'" under AEDPA.  *Perkins v. Herbert,* 596 F.3d 161, 177-78 (2d Cir. 2010) (citations omitted); 28 U.S.C. § 2254(d).

Accordingly, I recommend that Petitioner's claim challenging the constitutionality of the jury charge be dismissed.

## CONCLUSION

For the foregoing reasons, I recommend that the Petition be DISMISSED in its entirety.  I further recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

59

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have 14 (fourteen) days from service of this Report to file written

objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

George B. Daniels, United States Courthouse, 500 Pearl Street, Room 630, New York, New

York, 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl

Street, Room 525, New York, New York, 10007. Any requests for an extension of time for

filing objections must be directed to Judge Daniels. FAILURE TO FILE OBJECTIONS

WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND

WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE*

*AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968

F.2d 298, 300 (2d Cir 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988);

*McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        June 1, 2010

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. George B. Daniels, U.S.D.J.

Robert S. Dean, Esq.
Claudia S. Trupp, Esq.
Center for Appellate Litigation
74 Trinity Place, 11th Floor
New York, NY 10006

Morrie I. Kleinbart, Esq.
District Attorney's Office
One Hogan Place
New York, NY 10013